UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FILED - GR
July 24, 2024 12:43 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: KB   SCANNED BY: JW / 7-24

UNITED STATES OF AMERICA,

    Plaintiff,

v.

UTIBE EFFIONG, M.D.,

    Defendant.

_____/

1:24-cr-104
Jane M. Beckering
U.S. District Judge

**FELONY INFORMATION**

The United States Attorney charges:

## GENERAL ALLEGATIONS

At times material to this Information:

### The Medicare Program

1. The Medicare Program ("Medicare") was a federal health insurance program for people who met certain age and disability criteria. Medicare was a "health care benefit program" as set forth in Title 18, United States Code, Section 24(b).

2. Medicare's benefits included paying for medical care and medical products. People who received Medicare benefits were called "beneficiaries." The way Medicare typically worked was that, after a beneficiary received a benefit, those who provided the benefit would submit a claim to Medicare for payment.

3. Medicare had rules governing who was eligible to provide care and receive payment. One rule required physicians sign an agreement promising to obey the laws

and rules that governed Medicare. An authorized physician who provides medical care to beneficiaries is known as a "provider."

### The Defendant

4. The defendant, UTIBE EFFIONG, M.D., was a licensed physician in the State of Michigan, and resided and worked in Michigan.

5. EFFIONG was enrolled as a Medicare provider. As part of his enrollment, EFFIONG promised to obey "Medicare laws, regulations and program instructions." EFFIONG also promised not to "knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare," and not to "submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

6. EFFIONG's application to become a Medicare provider described criminal offenses that he should not commit, including violations of Title 18, United States Code, Section 1035(a), which authorized criminal penalties against a physician "who knowingly and willfully falsifies . . . a material fact; or makes any materially false . . . statements or misrepresentations . . . in connection with the delivery of or payments for health care[.]"

### Durable Medical Equipment

7. Medicare covered "durable medical equipment," sometimes called "DME." This category of medical products includes knee braces, suspension sleeves, back braces, shoulder braces, ankle braces, and wrist braces, as well as related testing.

8. Medicare's coverage of DME was subject to requirements and restrictions. In particular, Medicare covered DME only if it was medically necessary for the beneficiary and ordered by a qualified healthcare professional. Medicare paid claims for

DME only if the medical costs were reasonable; the DME was medically necessary and documented; and the DME was provided to the beneficiary as represented to Medicare.

9. To receive payment, a DME supplier was required to submit information about the beneficiary, including their diagnosis, the type of service provided, the date of service or supply, and a certification of medical necessity. DME suppliers were also required to have supporting documents on file, including records establishing that a qualified medical practitioner diagnosed the beneficiary and ordered the DME product.

### Genetic Testing

10. A type of service Medicare covered was diagnostic testing. This included genetic testing, in which medical personnel studied a beneficiary's DNA for mutations in genes that could indicate a heightened risk for certain conditions or diseases. To conduct genetic testing, a laboratory needed to obtain and test a patient's DNA. DNA samples were usually obtained from a patient's saliva by swabbing the inside of their cheek.

11. Medicare's coverage of genetic testing was subject to requirements and restrictions. In particular, Medicare covered genetic testing only if it was authorized by a medical professional who determined it was medically necessary to diagnose or treat an illness or improve certain body functions. In nearly all cases, Medicare did not cover genetic testing that was conducted merely for screening purposes.

### Real Time Physicians LLC

12. Real Time Physicians LLC was located in Boca Raton, Florida, and claimed to provide telemedicine services. In reality, Real Time created and maintained an

internet-based exchange that produced fraudulent medical records, which were used to cause Medicare to pay fraudulent claims for DME and genetic testing.

13. Real Time's exchange worked like this:

    a. Marketing companies uploaded information to the exchange about Medicare beneficiaries. They gathered the information in different ways, including through telemarketing calls and by purchasing data sets.

    b. The marketing companies paid Real Time to use the beneficiary information to populate medical assessment documents, which made it appear as though a doctor had evaluated each beneficiary and reached a medical conclusion that DME or genetic testing (or both) was warranted.

    c. The marketing companies also paid Real Time to hire physicians to log into the exchange, affirm that the assessments were valid, and sign doctor's orders for whatever the assessments indicated.

    d. Real Time then provided the assessments and signed doctor's orders to the marketing companies, which sold them to DME supply companies and genetic testing laboratories.

    e. The DME supply companies and laboratories provided the products and services indicated, and filed claims with Medicare for payment.

14. Real Time paid practitioners, including EFFIONG, $15.00 to $35.00 for each order they signed.

15. For each order, Real Time made the following documents available on the exchange for doctors (including EFFIONG) to review: (1) an "Assessment Summary" that

4

included patient demographics, an insurance summary, and answers to a medical questionnaire; (2) a pre-prepared patient encounter note, with a review of systems containing pain history, results of any objective physical assessments, other conditions and findings, a diagnosis, and a plan of care; and (3) an "RX/MEDICAL NECESSITY FORM" that contained patient contact and insurance information, pre-selected medical braces, pre-populated diagnosis codes, a pre-prepared doctor's note, and a "Physician Verification."

16. Real Time sent practitioners notifications when there were orders loaded into the exchange for their review. When a practitioner logged into the exchange, they could access an electronic dashboard for each order. From the dashboard, a practitioner could access the Assessment Summary, the patient encounter note, and the RX/Medical Necessity Form. Practitioners were not required to navigate to the Assessment Summary or patient encounter note. Instead, they could e-sign a doctor's note, approving an order, without reviewing anything beforehand.

17. For example, the completed patient encounter notes for DME braces included the following statements on behalf of the practitioner:

> Based on my evaluation of the patient's condition, I am ordering the following device(s)
>
> Based on my Assessment, I have determined it is medically necessary and appropriate to prescribe treatment today

Then, to approve an order for DME braces, practitioners selected the RX/Medical Necessity Form, navigated to the Physician Verification by clicking a button to bring up a signature box, and entered an electronic signature. The Physician Verification stated:

5

>by my signature, I am prescribing the items listed above and certify that the above-prescribed item(s) is medically indicated and necessary and consistent with current accepted standards of medical practice and treatment of this patient's physical condition.

18. Similar language was included in the patient encounter notes and orders for genetic testing.

19. To complete an order, practitioners clicked a "Save" button underneath the Physician Verification. Real Time's exchange maintained records of the exact date and time each practitioner clicked to open each order, and also the exact date and time each practitioner saved their electronic signature.

## CHARGE
(False Statement Relating to Health Care Matters)

20. The foregoing paragraphs are incorporated by reference.

21. On or about November 3, 2020, in the Western District of Michigan, Southern Division, and elsewhere, the defendant,

UTIBE EFFIONG, M.D.,

in a matter involving a health care benefit program, specifically Medicare, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations and used materially false writings and documents knowing them to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services.

Specifically, the defendant approved an order for two knee braces and two suspension sleeves for patient G.H., a Medicare beneficiary, supported by a patient

encounter note stating that the defendant ordered the braces and suspension sleeves "[b]ased on [his] evaluation of the patient's condition," and that "[b]ased on his Assessment," the defendant determined the knee brace and suspension sleeve were "medically necessary and appropriate." The defendant also electronically signed a "Physician Verification" for the knee braces and suspension sleeves order, indicating that "[b]y my signature, I am prescribing the items listed above and certify that the above-prescribed item(s) is medically indicated and necessary and consistent with current accepted standards of medical practice and treatment of this patient's physical condition."

In reality, the defendant never evaluated or assessed G.H.'s condition, never determined whether the knee braces and suspension sleeves were medically necessary and appropriate for G.H., and never determined whether the knee braces and suspension sleeves were medically indicated and necessary and consistent with current accepted standards of medical practice and treatment of G.H.'s physical condition. Instead, the defendant spent a total of 31 seconds accessing Real Time's exchange dashboard for this order, bringing up the RX/Medical Necessity Form, pulling up the signature box, affixing his electronic signature, and clicking to save the document. As a consequence, Medicare reimbursed a DME supplier a total of $1,633.88 for the knee braces and suspension sleeves ordered for G.H., which Defendant approved for delivery to G.H. at her residence in Manistique, Michigan, and which was subsequently delivered to G.H. there.

18 U.S.C. § 1035(a)(2), (b)

                                                MARK A. TOTTEN
                                                United States Attorney

Date: July 18, 2024                                 /s/ Patrick J. Castle
                                                PATRICK J. CASTLE
                                                Assistant United States Attorney